BURL TRIMBLE v. THE STATE.

No. 1048.    Decided June 14, 1911.

Rehearing Denied April 3, 1912.

**1.—Swindling—Sufficiency of the Evidence—Rule Stated.**

The Appellate Court must take all the evidence tending to establish the facts against the appellant and all reasonable and correct inferences from such facts as are proven, and if from all this, the verdict of the jury can be sustained, the Appellate Court is bound thereby and can not on that ground reverse a judgment of conviction.

**2.—Same—Case Stated—Circumstantial Evidence.**

Where, upon trial of swindling, the case was one of circumstantial evidence which sustained the verdict, there was no reversible error. Davidson, Presiding Judge, dissenting.

**3.—Same—Evidence—Other Transactions.**

Where, upon appeal from a conviction of swindling, the case was one of circumstantial evidence, the State claiming that the defendant had sunk a certain shaft for minerals and thereby fraudulently obtained a thousand dollars, etc., and there was also some testimony with reference to another shaft sunk by defendant for the same parties and that these parties had made investigations with reference to said two shafts, there was no error in admitting this class of testimony, and objections thereto only went to the weight thereof.

**4.—Same—Bill of Exceptions—Evidence.**

It is elementary that bills of exception to the admission or exclusion of testimony must within themselves contain such matter and point out the error alleged to have been committed, and where, upon trial of swindling, the objection to the testimony was that it was not responsive to the questions asked, but the bill of exceptions did not show that said testimony was inadmissible, there was no reversible error.

**5.—Same—Evidence—Bill of Exceptions—Other Transactions.**

Where, upon trial of swindling, defendant was charged with salting a lead mine, and there was testimony that defendant had dug two shafts for one of which he was being tried, and he objected to testimony as to the shaft for which he was not tried, but the bill of exceptions did not show or point out the error in the admission of such testimony, the same could not be considered on appeal.

**6.—Same—Evidence—Bill of Exceptions.**

Where, upon trial of swindling by means of digging a certain shaft for

lead, etc., there was testimony with reference to another shaft which defendant had dug for the same parties, and the parties injured claimed that defendant had swindled them by putting lead in the shaft for which he was being tried, a bill of exceptions with reference to testimony as to taking out lead out of an auger hole of the first shaft for which defendant was not on trial, which did not point out the error, could not be considered on appeal.

**7.—Same—Charge of Court—Other Transactions—Limiting Testimony.**

Where, upon trial of swindling by means of digging a shaft for natural lead, there was testimony as to another shaft which defendant had dug before the one for which he was being tried and in which it was contended he had also placed lead to deceive the persons injured, there was no error in submitting a charge limiting said testimony to the developing of the res gestae and the intent of defendant.

Appeal from the District Court of Knox. Tried below before the Hon. Jo A. P. Dickson.

Appeal from a conviction of swindling; penalty, two years imprisonment in the penitentiary.

The opinion states the case. See attorney's brief.

*D. F. Goss* and *D. A. Holman* and *Troy Pace,* for appellant.—When a witness answers a question propounded, and then makes an additional statement not called for and not responsive to the question asked, if such additional statement is immediately objected to by interrogater, he can not be held responsible for eliciting such additional testimony, and upon objection, that portion of the answer should be stricken out. Lindsay v. Jaffray, 55 Texas, 626; Johns v. Northcutt, 49 Texas, 444.

A charge by the court limiting consideration of testimony objected to by defendant, to a purpose, for which it was utterly incompetent, and yet prejudicial to defendant, is reversible error. Baker v. State, 4 Texas Crim. App., 223; Boyd v. State, 31 S. W. Rep., 531; Parker v. State, 34 S. W. Rep., 265; Greta v. State, 9 Texas Crim. App., 429.

This court erred in its interpretation and application of the principles of law applied to this case in the opinion in this, to wit: "This court must take all the evidence tending to establish the facts against the appellant and all reasonable and correct inferences from such facts as are proven, and if from all this the verdict of the jury can be sustained, this court is bound thereby and can not, on that ground, reverse a judgment of conviction." Whitehead v. State, 137 S. W. Rep., 366; Clark v. Pearce, 80 Texas, 146; DeWitt v. Brown, 138 S. W. Rep., 1147; Tel. Co. v. Sanders, 138 S. W. Rep., 1181; Brown v. State, 32 Texas Crim. Rep., 119; Walker v. State, 14 Texas Crim. App., 609; Tollett v. State, 44 Texas, 95; Jones v. State, 5 Texas Crim. App., 86; Arcia v. State, 28 Texas Crim. App., 198; McGrew v. State, 10 Texas Crim. App., 539; Roe v. State, 25 Texas Crim. App., 33; Wetzell v. Robinson, 138 S. W. Rep., 415; DeWees v. Bluntzer, 70 Texas, 408; Pridgen v. State, 31 Texas, 420; Stewart v. State, 35 S. W. Rep., 985; Mitchell v. State, 36 Texas Crim. Rep., 278; Roseborough v. State, 43 Texas, 570; Porter v. State, 1 Texas Crim.

App., 394; Schultz v. State, 13 Texas, 401; Jernagin v. State, 10 Texas Crim. App., 546.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, J<small>UDGE</small>.—On September 16, 1910, the grand jury of Knox County indicted the appellant for swindling. The indictment is in two counts. Each is a substantial copy of the other, except that in the first the appellant is charged with swindling twelve persons, naming them, out of $1,000 in money. The other charges the same thing, except that it charged the money was secured through a check issued by said persons on a bank; that the check was cashed, the appellant got $100 of the money at the time and placed the other $900 to his credit in the same bank.

Briefly stated the indictment charges that the appellant on March 24, 1910, in Knox County, Texas, with devising and intending to secure an unlawful acquisition of said $1,000, the property of twelve certain persons, naming them, trading and doing business under the name of Goree Mining Company, a partnership, with the intent to appropriate the money to his own use; that on said date said appellant induced said company to enter into a written contract with them whereby they employed him to sink a shaft five feet square on premises leased by them from T. J. Cartwright, and continue the shaft until he shall have passed through a strata or bed of mineral not less than five feet thick for which they agreed to pay him $1,000, he to begin the shaft within a reasonable time after the written contract was entered into and continue the work until the amount of mineral had been found and if he failed to find and show said company in said shaft the amount of mineral to the full thickness mentioned, then he was to have nothing for his work; that the meaning of said parties in the contract was that the strata or bed of mineral should be a natural strata or bed of mineral and be found in its natural states as it existed in the ground before it had ever been taken therefrom. That in pursuance of said contract appellant did dig and cause to be dug on said land for said company a shaft of the dimensions specified to the depth of about twenty-six feet and on April 20, 1910, unlawfully and fraudulently acquired possession of said $1,000 from said persons by means of false and deceitful pretenses, devices and fraudulent representations then and there unlawfully, fraudulently and knowingly made to said persons composing said company by so falsely and fraudulently representing that he had found and caused to be found in said shaft a strata or bed of mineral of more than five feet in thickness in its natural state, and meaning that said mineral was not placed in said shaft and had not been caused to be placed therein by him or through his agency or procurement, and then and there showed to them a quantity of mineral ore in said shaft, and by said

false and fraudulent representations induced them to pay said money to him, they relying upon his representations in paying the money to him. That in truth and in fact said bed and strata of mineral so shown and exhibited by him in said shaft to them, was not a natural bed or strata but was placed therein and caused and procured to be placed therein by him in pursuance and with the intention and for the purpose of unlawfully and fraudulently acquiring title and possession of said money from said company; that all of said mineral claimed to have been found by him in the natural state was false and untrue and he well knew it.

This will give in a brief way such substance of the indictment that the charge can be understood. Appellant was tried on September 26, 1910, convicted and his punishment assessed at two years in the penitentiary.

The record is of considerable length. The questions raised and to be decided are but few. One of the material ones is appellant's claim that the evidence does not sustain the verdict. The conviction was secured by circumstantial evidence alone. The charge of the court submitted all the questions and charged on circumstantial evidence in a fair and full charge, unless it be one and only one objection thereto which will be noticed later.

The jury and the court below, by our law, are made the exclusive judges of the testimony and the weight to be given thereto and the credibility of the witnesses. This court can determine none of those things, ordinarily. When the question of the sufficiency of the evidence is raised in this court it is the duty of this court to determine from all the evidence whether there is a sufficiency of it, if believed by the jury, to sustain their verdict. This court can not undertake to decide the questions of fact in the case. It must take all the evidence tending to establish the facts against the appellant and all reasonable and correct inferrences from such facts as are proven, and if from all this the verdict of the jury can be sustained this court is bound thereby and can not on that ground reverse a judgment of conviction.

Besides some documentary evidence introduced there were some seventeen witnesses who testified. We will not undertake to give all of the testimony, nor what each witness separately testified, but we will undertake to give such a summary of the whole evidence as will show whether or not the verdict of the jury was supported by the evidence, and the just and reasonable inferences which the jury was authorized to legally conclude therefrom.

The testimony thus summed up shows that the appellant was practically raised and had lived a long time in the mining district in Arkansas, where lead mines had been found and lead ore had been mined. That about six weeks or two months before he made the contract with the interested parties to sink this shaft he had gone to Goree, a small town in Knox County, from said mining district of

Arkansas, and represented to said interested parties that he was familiar with mining and knew how to locate and find minerals in the earth; that they relied upon and believed his representations and thereupon about a month before he was employed to dig or sink the shaft about which this prosecution arose, he made a contract with the same company for $100 to dig what is designated the first hole or shaft for them. This he dug only some ten or twelve feet deep and, claimed and represented to them that he had been successful in finding and securing a strata of about five feet in thickness, rich in lead ore, which they believed and relied upon.

Just about the time he made this first contract with them to sink the $100 hole or shaft, his father who lived in the lead mining district of Arkansas, was shown to have brought from a locality therein to a shipping point samples of lead ore claimed to have been mined in the Arkansas mines; he brought this to the shipping point in a grass or tow sack, loose. He procured from some mercantile establishment a box about two and a half feet long, two feet wide and one or one and a half feet deep in which he packed these samples of lead ore in some excelsior and shavings. Persons saw him bring in this lead ore in the grass or tow sack, saw him procure and pack the same in said box. He stated at the time that he was going to send it to appellant in Texas. The witnesses who saw this testified that they did not know the weight of this lead but at the time they estimated it to weigh from 100 to 150 pounds. One of these witnesses testified that the books of the railroad company at the point of shipment showed a shipment of this character to appellant from his father on February 20, 1910, the weight of which was 110 pounds. This shipment was shown to have been made to appellant at Bomarton, Texas. This witness and another who saw appellant's father bring this lead in, in said tow or grass sack, and pack it, as stated above testify he said he was going to send it to the appellant at Goree, Texas, where this contract was made and near which these shafts were dug. A brother of the appellant arrived at Goree about the first of April, 1910. This brother helped dig this shaft, but did not testify on the trial. Shortly before the arrival, appellant saw one of the witnesses who ran a transfer and livery business at Goree, and told him he was looking for his brother to arrive from Arkansas on the train, and engaged him to haul whatever baggage his brother should bring from the depot to his, appellant's, place which was some distance from the depot; that appellant's brother arrived at night at Goree with a box of about the same size and dimensions that his father packed said lead ore in. When this witness, who had been engaged by appellant to haul whatever baggage his brother arrived with, saw them meet, and this box, he approached the appellant and asked him if that was his brother and if he wanted him to haul that baggage for him; appellant stated it was his brother but declined to have him haul the baggage. Just after the train left and before the

check was taken off of the box by the railroad agent, the appellant and his brother started off with the box. There were rope handles to it at each end. Each of them had hold of these handles carrying the baggage. When the agent saw them making off with the box, he stopped them and did not let them proceed until he had secured the check off the box.

Samples of lead ore which were taken out of these shafts or holes dug by appellant, and also another which was procured from Arkansas in about the locality where the father had made this shipment from, were produced and introduced in evidence and the two witnesses from Arkansas who had seen the shipments of lead ore by appellant's father from Arkansas, testified that the samples introduced in evidence, the best they could tell, was of the same character and size of the lead samples that were so shipped to appellant.

Appellant began the sinking of the second hole or shaft some four or five days after the said written contract of March 24, was made with said parties and continued the work something like three weeks before it was completed, he, himself, working at the mine or shaft practically all the time, sometimes in day time and sometimes at night. His brother also worked therein. They worked a set of hands in the day time, as well as another set of hands a part of the night, usually working at night until about 11 o'clock, while the shaft was being dug or sunk. After sinking the second hole or shaft—or as it is frequently designated by the witnesses, the $1,000 hole or shaft— about fifteen feet, the appellant began to claim that he was securing and had struck lead ore. He dug that hole about twenty-six feet deep and claimed that he had gone through a vein of lead ore at least nine feet thick and claimed to have found a large deposit of natural lead ore therein. After getting down some ten or twelve feet deep, the soil or clay was very hard and dry. It could not successfully be dug with picks or shovels. Upon reaching this depth, the plan of digging pursued was that the appellant would have a hole bored in the bottom, usually some fifteen or twenty inches deep, and he would then fix a dynamite with fuse and blast. He, himself, always fixed these charges of dynamite, attaching a fuse thereto with a cotton string. At no time during the digging was there ever any ore found and at no time did the auger with which the boring was done, ever strike any lead or ore. The place where the hole or shaft was sunk was some few miles from the town of Goree, where all of the hands, it seems, stayed and procured their meals and they were hauled back and forth from the town to the shaft for this purpose. During these haulings back and forth, the appellant was shown to have carried with him a small sized grip. What was in this grip was not shown by anyone, except that it was claimed by appellant to have been used by him to carry back and forth his working clothes. No other of the various workmen who worked in the mine were shown to have carried back and forth at any time any grip or other luggage.

When the holes were bored with the auger and the dynamite blast was ready to be set, all of the other workmen got away from the hole so as to prevent any accident thereby. After the appellant would fix the fuse, he would come out of the hole and from time to time was seen to throw things in or toward the hole. What this was was not shown otherwise by any witness. After the appellant claimed to have struck the vein of ore, upon each blast, the soil or clay in the bottom was considerably torn up and loosened and the appellant would then find chunks of lead ore—some from small sizes up to some considerable size—from the size of a tea cup, or the double fist, and in one or two instances even larger pieces. No ore was found at any other time by any other person. After each blast all of this loose dirt with what little ore was therein was removed until the hard soil or clay was again struck, when another bore and blast took place.

From the time during the sinking of this hole after these blasts, this lead ore was shown to some of the interested parties, and after the last blast took place neither the loose nor the claimed lead ore was removed, but it was left in that state at the instance and direction of the appellant. When he had gone through this claimed strata or lead ore to the thickness of perhaps nine feet and on the morning of April 20, 1910, the appellant claimed that he had complied with his contract, and took some two or three of the interested parties out to the hole or shaft and exhibited to them the hole with the loose dirt therein, as shown by the last blast and the lead ore scattered about through this loose dirt. He did not permit any of them at that time to remove any of this dirt or ore, but after showing it to them, claimed that he had complied with his contract and demanded that they should pay him the $1,000 therefor. They wanted to go into the shaft, remove this loose dirt and dig to see if they could find any lead ore, but appellant refused to let them do so. After this cursory examination by some of these interested parties, upon his representations and statements that he had complied with his contract and upon his demand, they settled with him and paid him the $1,000. They paid it in a check on the local bank for $1,000. The appellant at once went to the bank and presented the check, and $100 cash was paid thereon to him that day and the balance, $900, was deposited by him in the bank or left in the bank to his personal credit. At the time they settled with him and thus paid him the thousand dollars, they all believed and relied upon his representations that the ore he had found was the natural ore found in the soil, and claimed by him to be a strata some nine feet in thickness producing this natural ore. At once thereafter, during the same day, and especially during the morning of the next day the various interested parties and others went out to the shaft, down in it and began to make examinations. The appellant did not consent that any of them should make an extended examination or remove the loose soil or lead, until after he was settled with and paid the $1,000. He also stated to them

at the time, and prior to the settlement and payment, that in the northwest corner of that locality of the hole just outside of where he had dug, there was a large deposit of this natural lead ore and that it could be found by digging therein.

This shaft was contracted to be dug or sunk by the interested parties, not for the purpose of working the mine themselves, but for selling it to other parties as they were not financially able to supply the machinery and do the work and none of them were miners or knew anything about mining. Appellant claimed at the time that none of the ore should be removed by any of the persons, but left in that state which he had left it, so that it could be exhibited to and would induce purchasers for the same at a large price and value. As stated above, on the next day, or probably the same day, the interested parties' suspicions were aroused, and they thereupon began to make further investigation to see, if as a matter of fact, the natural ore had been found and discovered therein. They thereupon went to the shaft, dug out all of the loose dirt and the ore thereon, or therein, and upon examination of the various samples of lead ore which was found, they found that various pieces of various sizes of this lead ore had moist soil around it of a different color from the color of the natural soil in the mine, and upon several pieces of the ore they found strings of tow twine of lengths from three quarters of an inch to an inch and a half long. On one of the pieces in a crevice on the ore they also found what they stated to be a small spider web. After removing this loose soil and the lead ore scattered around through it, they dug down some feet further in the bottom of the shaft. They never found any other lead ore, or traces thereof. They also dug from fifteen feet from the top into the side of the shaft, from three and one half to five feet in the side thereof, where appellant claimed they would find rich deposits of this lead ore, but they never found a single piece or a trace of lead ore therein. In fact, with all of the digging experiments and investigations they made, they never found any other lead ore therein or any trace of it.

Just about the time—some of the witnesses say just before—others say immediately after—they had settled with the appellant, their suspicions being aroused, they made an investigation in the first or $100 shaft which the appellant had previously dug for them. At the time when he had completed that shaft, which was a month or less before they made the contract with him to make the other or $1,000 shaft, the appellant had left the loose dirt therein after the last blast in which various pieces and sizes of lead, corresponding in size and dimensions with those found in the last hole, just after it was claimed to have been completed by the appellant, and they found that the same character of lead ore was therein that had been found by them, or was afterwards found by them in the last, or $1,000 hole. Various experiments were had by them upon finding these pieces of lead ore in both shafts, and upon investigation it was ascertained

by them that where these samples of lead ore were found to be imbedded in the sides or bottoms of the holes, they taking various instruments, such as their pocket-knives and pencils and exploring around where these pieces of lead ore appeared, to be naturally in the soil, uniformly the soil around them and back of them was loose and the immediate soil around the various pieces had clay of a different color around the samples from that of the natural soil in the shafts. Immediately after the completion of the first or $100 shaft, the interested parties at the suggestion of the appellant procured lumber and safely closed up the top of the shaft so that it could not be investigated and it was not investigated until the completion and payment for the last or $1,000 shaft.

Upon the claimed completion of the last or $1,000 shaft, and when there was some hesitancy about the payment therefor to the appellant, he proposed to some of the interested parties, in effect, that if they doubted his claim about the matter he would take the shaft and pay them $1,500 therefor. These persons to whom he made this proposition stated that they would submit it to the others and let him know at once whether they would accept his offer. Upon consultation, among themselves, they communicated back to him the proposition that they would turn it over to him if he would pay them back their $1,000, but he declined to do this.

Before the last contract for the $1,000 hole was made with the appellant, he claimed to them that he was an experienced miner, could tell what was in the soil; that he had a switch or instrument which he had experimented with out on the ground and that in a very short distance from where the first hole was sunk, that his switch had indicated that this particular locality, where he would sink this $1,000 shaft if they would make the contract with him, had torn up the earth and that there was a rich deposit of ore at that particular locality. They relied upon and believed these representations before and at the time they made this contract with him and until after he had completed the second or $1,000 shaft, and had paid him the said said money, $1,000, still believing and relying upon his representations of what he had found, and that the said shaft had a vein therein of natural lead ore nine feet thick. There are many other circumstances shown by the testimony, unnecessary to detail, which tend to show that there was no natural lead ore found by the appellant in either of these shafts, and that which was found therein, was placed therein just before or at the time of these several dynamite blastings. The testimony of the witnesses from Arkansas, one of whom had worked in the mines in Arkansas considerably, and both of whom showed more or less knowledge of such mines, tended to show that the soil or clay, that immediately surrounded these various samples of lead ore which were taken out of both of these holes, was not of the color of the soil out of either of them, and that it more nearly resembled the color of the soil of the mines in Arkansas. It was also shown that in the last or

$1,000 hole or shaft, upon investigation by the interested parties, after the appellant was paid, that they found a shaving which corresponded with some of the shavings in which the appellant's father had packed the samples of the lead that he had shipped from Arkansas to the appellant. It was also shown that all of the samples of lead that were taken out of both of the mines had damp soil around them, and that the other soil in both holes was dry. That upon investigation, after the $1,000 hole had been paid for, they also found an auger hole in the bottom of the first shaft, some twenty-two inches deep and two inches in diameter, in which were also found various pieces of small size lead ore, and that the soil in this hole in which these samples were found was moist, while all of the other soil in the first shaft was dry. The testimony indicated that some one had been in the first hole after it was claimed to have been completed and closed up, and before the investigation thereof was made, and this bored auger hole with the lead sample was found therein. When this was, or by whom it was made, was not shown by any direct testimony. Such of the State's witnesses as were examined upon the point denied that they had made them or that they had been made with their knowledge or consent, or with the knowledge or consent of any of the interested parties.

We have carefully, time and again, gone over and considered all of the evidence introduced in this case, and we have reached the conclusion that the jury was justified in finding the verdict of guilty against the appellant which they did, and we, therefore, hold that the court did not err in overruling the motion of appellant on that ground and that we are not authorized to set aside the verdict on that ground.

The first three bills of exception, which are three of the questions raised herein, were to the admission of the testimony of the various witnesses about the investigations they had made in the two shafts, after they had paid the appellant the $1,000 for the last. Some of this testimony showed that the persons had made these examinations in from one to six days after the appellant had been paid. The grounds of the objection of the appellant to this testimony was that it was after the interested parties had been in the possession of both of these holes, the first about a month, and the last from one to six days, respectively, without any testimony to show when, how or by whom the said tow ravelings came to be on the said lead or found in the shafts and the spider web found on one piece, and the shavings in the last or $1,000 hole.

In our opinion this testimony was clearly admissible. We think the objections were not sufficient to exclude the testimony, but went to the weight of the testimony only and this matter was entirely for the jury.

Appellant's fourth bill of exceptions is a kind of omnibus bill. The first of it is in substance as follows: When the State's witness, R. Whitfill, was on the stand and on cross-examination by appellant's attorneys, was asked this question: "Did you not tell Judge Goss that there were as many as four hundred pounds of lead taken out

of the mine?" to which he answered: "Yes, but I didn't know then that the defendant had taken one hundred and fifty pounds out of the first hole, and put it in the mine," to which testimony concerning the first hole the defendant then and there objected, because it was not responsive to the question asked, and because there was no evidence that defendant had taken any lead out of said hole and it was immaterial, incompetent and inadmissible on any issue in the case. The court overruled this objection to which appellant excepted. It is elementary in this court now, that bills of exception to the admission or exclusion of testimony must within themselves contain such matter, as to show this court thereby that error has been committed and that this court can not look to the statement of facts or any other part of the record to aid any bill of exceptions. Applying these requisites to this bill of exceptions, it is clearly our opinion that the bill does not show that this testimony was inadmissible, or that we can infer from it that there was error, because no such state of facts is shown thereby as to justify us in so concluding.

This bill then proceeds to say that thereafter on re-examination, over the objection of the defendant, the State offered to introduce testimony by said witness concerning another shaft which had been dug by the defendant for said Goree Mining Company, about two months before and which the witness designated as the first hole. The defendant objected to "any testimony whatever concerning said shaft or first hole, because it was wholly irrelevant, immaterial and inadmissible for proving any fact in the case; because there was no connection shown between the digging of the first hole and the second hole or shaft for the alleged fraud in connection with which the defendant stands indicted. The court overruled the objection stating at the time that he would admit the testimony and control it by his charge to the jury. To which action of the court the defendant excepted. Thereupon the witness testified that, as president of the Goree Mining Company, he had employed defendant to dig said first hole, that it was dug about seven or eight feet deep, and that there was found about one hundred and fifty pounds of lead, and that he stopped the defendant from digging any further, considering that they had a good prospect, and that the lead was left in the bottom of the mine; and further, that on his visiting the first hole or shaft on Monday after the settlement for the second hole or shaft, he found only one piece of lead ore in said shaft." What we have said about the first part of this bill of exceptions equally applies to this.

This bill then further proceeds as follows: "And further the State offered to prove by J. A. Mayberry and I. B. Phillips that they visited said first hole on Monday, after the settlement for the second shaft had been made on the Wednesday before, and that they found that some one had been in the hole recently and some mud had been freshly bored out, and this exciting their suspicion, they took some of this mud with them and went back to Goree and showed it to some of the

members of the mining company; and thereupon W. P. Edwards, R. Whitfill and others went back to the said hole and found a lump of ore in said first hole, and removing the same, the said W. P. Edwards, dug down with his knife in the dirt and found a small lump of lead, and taking it out, discovered an auger hole filled with small pieces of lead ore and about twenty-two inches deep; and that on taking out the lead the bottom of the auger hole was found to be damp or wet, showing that the dirt had been recently taken out of it, the bottom of said first shaft being otherwise dry." To all of which the defendant objected because there was no testimony connecting defendant with any of the facts testified to concerning said auger hole and because said testimony concerning said first hole or shaft was immaterial, irrelevant, and inadmissible, and prejudicial to the defendant, all of which objections were overruled by the court and the testimony admitted. This bill, embracing these several matters, is all in one bill and signed and allowed by the judge in the way we have quoted above. What we have said about the first part of it, equally applies to this last part as well.

The only other question raised by appellant is his fourth ground of the motion for new trial which is that the court erred in giving to the jury the following charge : "In this case, if you believe there is evidence tending to prove the digging of another hole or shaft in which mineral or lead ore had been placed or found, shortly prior to the digging of the hole or shaft in controversy in this case, you are instructed that you can only consider such testimony for the purpose for which it was admitted, that is, to establish the identity in developing the res gestae of the alleged offense or to prove the guilt of the accused by circumstances connected with the offense, if any; or to show the intent with which the defendant acted with respect to the property for the swindling of which he is now on trial; and you will consider it for no other purpose; for you can not convict the defendant for the swindling of any other property than that named in the indictment for the digging of what has been termed and designated in this case as the thousand dollar hole or shaft." The appellant objected to this charge as urged by this ground of the motion for new trial : "1. Because, while there was testimony as to the digging of another shaft, there was none whatever that lead had been placed therein to warrant such charge, and the assumption of that fact in the charge was prejudicial to the defendant in view of the charge as to the purpose for which they could consider it. 2. There was no question of 'identity in developing the res gestae of the offense charged' that called for or would authorize the testimony as to the first hole, an entirely different transaction, and between which and the second hole no connection whatever is shown. 3. To prove the guilt of the accused by circumstances connected with the offense, 'if any,' which is a limitation that does not limit. The jury were authorized to consider it as broad upon the question of guilt as any other testimony in the case. If they found that a freshly bored hole on the first shaft

was loaded, they had a right to infer therefrom, if they so believed, that the second shaft was loaded, although this freshly loaded hole was made and discovered months after the shaft was in the exclusive possession of the company, without any evidence whatever showing any connection therewith by defendant, and when no motive could possibly have prompted defendant to do it, and when every consideration on his part was to the contrary. 4. Nor could it by possibility show the intent with which defendant noted with respect to the property 'for the swindling of which he is now on trial,' at least, until it could show his intent in digging the first hole, of which there is not a particle of evidence; and the evidence so charged for that purpose is utterly incapable of showing it. There is no testimony that lead had been loaded or placed in the first hole, except the first auger hole made and loaded six days after the completion of the second or $1,000 hole, and no connection therewith shown by defendant.

"It was admitted that 150 pounds of lead was found in shaft No. 1 only seven feet deep, paid for and held for over two months without suspicion or charge of having been loaded, and no testimony in this case shows that said 150 pounds was put in there, and no direct proof that the lead in this fresh auger hole was brought from elsewhere. This charge authorized a latitude in considering testimony erroneously admitted that was most damaging to defendant contrary to law, and entitles him to a new trial."

Proof of other similar offenses by the appellant, committed at or about the same time, are admissible to establish identity in developing the res gestae, or in making out the guilt of the defendant by a chain of circumstances connected with the crime for which he is on trial. See Speights v. State, 1 Texas Crim. App., 551; Satterwhite v. State, 6 Texas Crim. App., 609; Street v. State, 7 Texas Crim. App., 5; Jones v. State, 14 Texas Crim. App., 85; McCall v. State, 14 Texas Crim. App., 353; House v. State, 16 Texas Crim. App., 25; Kelley v. State, 18 Texas Crim. App., 262; Williams v. State, 24 Texas Crim. App., 412; Coward v. State, 24 Texas Crim. App., 590; Musgrave v. State, 28 Texas Crim. App., 57; Morris v. State, 30 Texas Crim. Rep., 95; Jackson v. State, 33 Texas Crim. Rep., 281. Many other cases might be cited establishing the same doctrine, but we deem it unnecessary to cite others. It is our opinion that the charge of the court complained of in this case was not error under the circumstances and facts developed on the trial of this cause. It is always proper for the charge, when testimony is admitted of other independent crimes by the appellant, to restrict the consideration thereof by the jury to these purposes as was done by the charge of the court in this case.

There being no reversible error pointed out in the trial of this case it will be affirmed.

*Affirmed.*

DAVIDSON, PRESIDING JUDGE.—I am of opinion the affirmance

is wrong. The rehearing should be granted for the several reasons assigned by appellant and cause reversed. Reporter will give substantial statement of questions and record.

### ON REHEARING.

#### April 3, 1912.

PRENDERGAST, Judge.—This cause was affirmed just before the close of the last term of this court. A motion for rehearing was thereafter filed to this term. In it appellant complains of various conclusions from the testimony that the court reached and stated in the original opinion. There is but one which we think is correctly criticised and that is where this court in the original opinion stated in giving the effect of appellant's testimony that "he, himself, always fixed these charges of dynamite, attaching a fuse thereto with a cotton string," which is incorrect. Instead, the testimony shows that while he generally did this that his brother-in-law, who worked for him and with whom he boarded and who did not testify in this case, sometimes fixed the dynamite charges. This, however, in no way effected the decision of the case or would or should change the result of the decision.

The other complaints by appellant as to the different findings of fact in the original opinion are without merit. We did not quote or intend to quote the testimony of any given witness at any time, unless the opinion shows that fact, but, instead of giving the testimony of the various witnesses, after studying the whole of the testimony, we stated the conclusions reached therefrom and they are all substantially correct. We did not purport to give our conclusions from the whole testimony in the language of any one or more witnesses, but from the whole we reached certain conclusions and stated them in our own language.

We have again carefully gone over the testimony and the record in this cause, and we are satisfied that the case has been correctly affirmed. It is unnecessary to take up and discuss again any of the questions or the testimony. The motion for rehearing will, therefore, be overruled.

*Overruled.*